997 P.2d 13

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Wayne Thomas JENKINS,
Defendant–Appellant.**

No. 22071.

Supreme Court of Hawai'i.

April 6, 2000.

Dwight C.H. Lum, Honolulu, on the briefs, for the defendant-appellant Wayne Thomas Jenkins.

Donn Fudo, Deputy Prosecuting Attorney, on the briefs, for the plaintiff-appellee State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, JJ., and Intermediate Court Judge WATANABE, Assigned by Reason of Vacancy.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Wayne Thomas Jenkins appeals from the judgment, guilty conviction, and sentence of the first circuit court, filed on October 20, 1998. Jenkins raises eight points of error on appeal, namely, that: (1) the circuit court erred in denying Jenkins's motion to suppress evidence; (2) the circuit court erred in refusing to dismiss the case or allow Jenkins a continuance to investigate the "inadvertent" destruction of evidence; (3) the circuit court abused its discretion in admitting testimony pursuant to Hawaii Rules of Evidence (HRE) Rule 701 (1993);[1] (4) the circuit court should have granted Jenkins's motion for judgment of acquittal; (5) the circuit court erred in instructing the jury regarding recklessness as the state of mind requisite for "possession"; (6) the circuit court erred in failing to instruct the jury regarding certain material and essential elements of the crimes charged; (7) the circuit court's unanimity instruction was prejudicially confusing; and (8) the circuit court committed plain error in that the length of Jenkins's prison sentence amounted to cruel and unusual punishment. Because we agree with Jenkins's fifth and sixth points of error, we vacate the circuit court's judgment and remand for a new trial. Although our holding with respect to the foregoing points is outcome-dispositive of the present appeal, we address Jenkins's remaining arguments in order to provide guidance to the parties and the circuit court on remand. *Cf. State v. Davia*, 87 Hawai'i 249, 252, 953 P.2d 1347, 1350 (1998).

## I. BACKGROUND

### A. Factual History As Adduced At Trial

In August 1997, Jenkins was living in Kahuku, in the City and County of Honolulu, with a friend by the name of Robert Cartwright. On the night of August 2, 1997, another friend, Aloha Trice, came to visit Cartwright. At some point between 1:00 a.m. and 2:00 a.m. on the morning of August 3, 1997, Trice stated that she wanted to go to the store.

Jenkins asked Cartwright if he could borrow a truck to drive Trice to the store. Cartwright handed Jenkins a set of keys and told him that "the truck was out front on the road." Cartwright told Jenkins that he had "just bought the truck." The vehicle outside of the house was a black Toyota truck, "lifted" with large tires. Jenkins had not traveled in the truck before. Jenkins and Trice entered the truck and drove north on Kamehameha Highway, in the direction of Lā'ie and Hau'ula, the only towns with stores open at that time of night. As Jenkins was passing the Lā'ie Shopping Center, he noticed that he was being followed by a police officer.

Officer Ofeina Unga of the Honolulu Police Department (HPD) testified at trial as follows. During the early morning hours of August 3, 1997, he noticed a black Toyota truck, equipped with large tires and modified suspension, operating with expired tax and safety decals. He asked his dispatcher to confirm that the decals had expired and received an affirmative response. He activated his blue lights and siren, and the truck pulled over at the corner of Naniloa Loop and Iosepa Street.

Officer Unga stopped his police vehicle about ten to twelve feet behind the truck and

---

1. HRE Rule 701 provides:
 **Opinion testimony by lay witnesses.** If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

left his headlights on. He noticed two people in the truck, both of whom were "moving around a lot trying to turn around and look at me and look out the windows and see what my position was in relation to them." Because this was more movement than that to which he was accustomed, Officer Unga approached the truck by walking in a loop from his car to the truck so he could have a straight view into the window on the driver's side.

As Officer Unga was walking toward the vehicle, he noticed a black pouch and what appeared to be an eyeglasses case drop out of the passenger's side of the truck. He then observed the passenger, whom he later identified as Trice, open her door and begin to step out of the vehicle. He yelled at her to stay in the truck, but she leaped out of the truck, grabbed some of the items that had fallen to the ground, and returned to the vehicle.

Officer Unga ran around the back of the truck to the passenger's side. On the ground, in the area of the passenger's door, he observed an eyeglasses case and two "zip-lock packets" of what appeared to be crystal methamphetamine or "ice."[2] He opened the passenger's door and directed the occupants of the truck to place their hands on the dashboard.

Officer Unga leaned into the truck and, with the aid of his flashlight, observed a closed black pouch and a glass pipe on the seat between Trice and the driver, whom he later identified as Jenkins. Officer Unga feared for his safety and wanted to "deter-

mine if there was any threat" to him. He seized the pouch and felt the outline of a small handgun within it. He then removed the pouch from the vehicle.

Shortly after Officer Unga secured the black pouch, a backup police unit arrived. HPD Officer Channing Hawkins removed Jenkins from the driver's side of the truck. Officer Unga walked around to the driver's side and observed a small blue bag on the floor of the truck's cab. Protruding from the bag appeared to be the butt of a small handgun. Officer Unga removed the handgun from the bag. In the process of securing the handgun for transport, he noticed a second firearm in the bottom of the bag.

HPD Detective Terry Bledsoe testified that he obtained and executed a warrant to search the closed black pouch that Officer Unga had seized from the seat of the truck. Inside, he discovered a pistol and ammunition.

Jenkins testified that he was unaware of any of the three guns before they were discovered by Officer Unga. He further testified that, when he entered the truck on August 3, 1997, he did not know that there were any firearms in it.

### B. *Procedural History*

In connection with the foregoing events, on August 7, 1997, the grand jury returned an indictment against Jenkins, charging him with (1) one count (Count I) of possession of a firearm by a person convicted of certain crimes, in violation of Hawai'i Revised Statutes (HRS) § 134-7 (1993 & Supp.1997),[3] (2)

---

2. Regarding the packets, Officer Unga testified as follows:

> Officer Unga: And as I got closer I also noticed two packets on the ground in the area where all these items had fell on the ground on the passenger side.
> [Deputy Prosecuting Attorney (DPA)]: Have you had special training in the recognition of various substances as possible illegal drugs?
> Officer Unga: Yes.
> [DPA]: Have you had special training in the recognition and use of drug paraphernalia?
> Officer Unga: Yes.
> . . . .
> [DPA]: Okay. When you got around to the passenger side of the car and you saw those packets on the ground, what did you think they were?

> Officer Unga: It appeared to resemble crystal methamphetamine or ice.

3. HRS § 134-7 provides in relevant part:

> (b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.
> . . . .
> (h) Any person violating subsection . . . (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony.

one count (Count II) of possession of ammunition by a person convicted of certain crimes, in violation of HRS § 134–7, *see supra* note 3, and (3) three counts (Counts III, IV, and V) of place to keep pistol or revolver, in violation of HRS §§ 134–6(c) and (e) (1993 & Supp.1997).[4] Trice was named as a codefendant, but, on March 30, 1998, the circuit court granted Jenkins's oral motion for severance of the defendants.

Prior to trial, Jenkins moved to suppress evidence of the three handguns discovered in the truck. He also moved to suppress "any testimony by witnesses to events which occurred after the warrantless search and illegal seizure of evidence[.]" At the hearing on Jenkins's motion, Officer Unga testified in relevant part as follows:

[Jenkins's Attorney]: [G]oing first to the safety decal, okay, the safety decal, you said, was expired. What was the date that you saw on it?

Officer Unga: I can't recall the exact date, but one was October and November '95. They both expired in '95.

[Jenkins's Attorney]: Okay, you know what the color coding system is for safety decals, correct?

Officer Unga: I didn't notice the color. I just noticed that the expiration day and month did not match.

The circuit court denied Jenkins's motion to suppress and entered the following findings of fact and conclusions of law:

1. Officer Unga was credible on the stand.

2. Once someone in a car makes sudden, suspicious movements which may implicate officer safety, which is what occurred here, this takes the case out of the *Bolosan* scenario.

3. A case by case analysis is necessary when imputing problems of exigency to the driver of a car based on the actions of the passenger. Here, the size of the pouch makes it reasonable to infer that it could compromise officer safety. It was also reasonable for the officer and the court to infer that it was the same bag located in the center of the front seat of the car, between the driver and the passenger.

4. Officer Unga had specific and articulable facts upon which to stop the vehicle in this case, to wit, the expired tax and safety tags which were confirmed to be outstanding by HPD dispatch. *State v. Bolosan*, 78 Hawai'i 86, 890 P.2d 673 (1995).

5. The suspicious actions of the passenger could reasonably be interpreted to compromise officer safety and justified the officer's restraint of the driver and passenger and their removal from the vehicle. A brief investigatory stop based upon reasonable suspicion may ... develop evidence providing probable cause for arrest. *State v. Melear*, 63 Haw. 488, 630 P.2d 619 (1981).

6. Officer Unga's observation in plain view of what he reasonably believed to be illegal drugs on the ground justified the detention and removal of [Jenkins and Trice] from the vehicle.

7. The drugs on the ground and the guns on the driver's side floor of the vehicle were in plain view and therefore [Jen-

---

4. HRS § 134–6 provides in relevant part:

(c) Except as provided in sections 134–5 and 134–9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station.

. . . .

(d) It shall be unlawful for any person on any public highway to carry on the person, or to have in the person's possession, or to carry in a vehicle any firearm loaded with ammunition; provided that this subsection shall not apply to any person who has in the person's possession or carries a pistol or revolver and ammunition therefor in accordance with a license issued as provided in section 134–9.

(e). . . . Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. . . .

kins and Trice] had no reasonable expectation of privacy in those items. *State v. Kapoi*, 64 Haw. 130, 637 P.2d 1105 (1981).

8. The police properly obtained a search warrant for the container which was the object of the passenger's suspicious movements, the search warrant was valid and the gun found within is not suppressible.

After jury selection had commenced, the prosecution sent a letter to Jenkins indicating that it had "inadvertently destroyed" evidence, including a black cloth pouch, a glass pipe, two bags containing a white crystal substance, and an eyeglasses case containing make-up. Jenkins moved orally to dismiss the indictment or to continue the trial in order "to further investigate" the destruction of the evidence. The circuit court denied Jenkins's motion, noting that "there are no drug charges involving Mr. Jenkins in this case" and that the items had already been rendered inadmissible pursuant to Jenkins's motion in limine.

At trial, Officer Unga testified regarding the traffic stop as follows:

[Jenkins's Attorney]: Okay, do you recall testifying at a prior hearing, would have been back on October 28, 1997, do you recall giving testimony at that time?

Officer Unga: I believe so.

[Jenkins's Attorney]: Okay. And do you recall stating at that time that you didn't notice the color [of the safety and tax decals]?

Officer Unga: I noticed the month first.

[Jenkins's Attorney]: No, I'm asking do you recall giving—Let me ask you this. Do you recall being asked this question and giving the following response?

Question is: Okay, you know what the color coding system is for safety decals, correct?

Your answer: I didn't notice the color. I just noticed the expiration date and the month did not match?

Officer Unga: If that's what's in the testimony, I guess so, yes.

. . . .

[Jenkins's Attorney]: All right. But you're claiming now at this time that you did recognize the color [of the decals]?

Officer Unga: After reviewing some of the photographs.

. . . .

[Jenkins's Attorney]: How far behind were you following the truck when you looked at the dates [on the decals]?

Officer Unga: Approximately one car length.

. . . .

[Jenkins's Attorney]: Okay. Would you not agree then that it would be almost impossible to read· the year itself on the back of one of those decals?

Officer Unga: From that distance it would be a little difficult, yes.

Detective Bledsoe testified in relevant part as follows:

[Deputy Prosecuting Attorney (DPA)]: Okay. Are you familiar as a detective with the requirements of containers in which guns can be transported or carried in the State of Hawaii?

Detective Bledsoe: Yes, ma'am.

[DPA]: That requirement is a rigidly constructed container enclosing the gun entirely or a commercial gun case or the equivalent; correct?

Detective Bledsoe: Yes, that's correct.

[DPA]: I'd like to show you again [the two bags that Officer Unga found in the truck driven by Jenkins]. Do either one of those containers fit that qualification?

Detective Bledsoe: No, ma'am, they don't.

Jenkins objected to this testimony on the ground that Detective Bledsoe had not been qualified as an expert.

After the prosecution rested its case, Jenkins moved orally for a judgment of acquittal. Jenkins argued that (1) sufficient evidence had not been adduced to support a guilty verdict and (2) the evidence that was adduced actually inculpated Trice, rather than Jenkins. The circuit court denied Jenkins's motion, ruling that the prosecution had "presented evidence that satisfied the stan-

dard of having a prim[a] facie case made for each count."[5]

The circuit court gave the following of the State's Instructions over Jenkins's objections:

No. 1 In Count I of the Indictment, [Jenkins] is charged with the offense of Possession of Firearm by a Person Convicted of Certain Crimes.

A person commits the offense of Possession of Firearm by a Person Convicted of Certain Crimes if, having been previously convicted in the State of Hawaii or elsewhere of committing a felony, he owns, possesses, or controls any firearm.

There are three material elements of the offense of Possession of Firearm by a Person Convicted of Certain Crimes, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That, on or about the 3rd day of August, 1997, in the city and County of Honolulu, State of Hawaii, [Jenkins] owned, possessed[,] or controlled a firearm; and

2. That [Jenkins] had previously been convicted of committing a felony; and

3. That [Jenkins] did so intentionally, knowingly, *or recklessly.*

No. 11 In Count III of the Indictment, [Jenkins] is charged with the offense of Place to Keep Pistol or Revolver.

A person commits the offense of Place to Keep Pistol or Revolver if he carries or possesses a loaded or unloaded pistol or revolver without a permit or license to carry issued as provided in Section 134–9 of the Hawaii Revised Statutes, and in other than an enclosed container as required under Section 134–6(c) of the Hawaii Revised Statutes.

There are four material elements of the offense of Place to Keep Pistol or Revolver, each of which the prosecution must prove beyond a reasonable doubt.

These four elements are:

1. That, on or about the 3rd day of August, 1997, in the city and County of Honolulu, State of Hawaii, [Jenkins] carried or possessed a loaded or unloaded pistol or revolver, to wit, a .32 caliber revolver; and

2. That [Jenkins] did so without a permit or license to carry issued as provided in Section 134–9 of the Hawaii Revised Statutes; and

3. That [Jenkins] did so when the pistol or revolver was not in an enclosed container; and

4. That [Jenkins] did so intentionally, knowingly, *or recklessly.*

(Emphases added.) The circuit court also gave State's Instruction No. 2, which was virtually identical to No. 1, in connection with Count II of the indictment, and State's Instructions Nos. 16 and 17, which were virtually identical to No. 11, in connection with Counts IV and V of the indictment.

Regarding the definition of "possession," the circuit court instructed the jury as follows:

A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion over a thing, either directly or through another person or persons, is then in constructive possession of it.

The circuit court refused Jenkins's Supplemental Instructions Nos. 2, 3, and 4, which read in relevant part:

No. 2 In Count III of the Indictment, [Jenkins] is charged with the offense of Place to Keep Pistol or Revolver.

A person commits the offense of Place to Keep Pistol or Revolver if he knowingly or intentionally possesses and carries a loaded or unloaded pistol or revolver, to wit, a .32 caliber Iver Johnson revolver, without a license as provided

---

5. Jenkins renewed his motion for judgment of acquittal at the close of the evidentiary phase of the trial. He argued that "the elements o[f HRS § ] 134–6(c) have not been met." The circuit court denied Jenkins's motion.

by Sections 134–5 and 134–9 of the Hawaii Revised Statutes, and did knowingly or intentionally fail to confine said pistol or revolver as required under Section 134–6(c) of the Hawaii Revised Statutes.

There are six material elements of the offense of Place to Keep Pistol or Revolver, each of which the prosecution must prove beyond a reasonable doubt.

These six elements are:

1. That, on or about the 3rd day of August, 1997, in the City and County of Honolulu, State of Hawaii, Wayne Thomas Jenkins possessed a loaded or unloaded pistol or revolver, to wit, a .32 caliber Iver Johnson revolver; and

2. That Wayne Thomas Jenkins carried said loaded or unloaded pistol or revolver, to wit, a .32 caliber Iver Johnson revolver, *away from his place of business, residence, or sojourn;* and

3. That Wayne Thomas Jenkins did so without a license pursuant to Section 134–5 of the Hawaii Revised Statutes; and

4. That Wayne Thomas Jenkins did so without a license pursuant to Section 134–9 of the Hawaii Revised Statutes; and

5. That Wayne Thomas Jenkins failed to confine said pistol or revolver within an enclosed container pursuant to Section 134–6(c) of the Hawaii Revised Statutes; and

6. That Wayne Thomas Jenkins did all of the above either intentionally or knowingly.

(Emphasis added.) Jenkins's Supplemental Instructions Nos. 3 and 4, relating to Counts IV and V, were virtually identical to No. 2.

The circuit court also refused to give Jenkins's Supplemental Instruction No. 10, which stated: "In order to find [Jenkins] guilty under Count One, Possession of a Firearm by a Person Convicted of Certain Crimes, all twelve members of the jury must agree upon the same firearm that was knowingly possessed." Instead, over Jenkins's objection, the circuit court gave State's Instruction No. 26, which read as follows:

If and only if you find [Jenkins] guilty of Count I, you must determine that he (actually or constructively), intentionally, knowingly, or recklessly possessed or controlled at least one of the firearms referenced in this case.

A "Yes" answer to the following questions must be unanimous; if your answer as to a specific firearm is not unanimous, you must answer the question "No."

1. Did [Jenkins] possess or control a loaded or unloaded .22 caliber pistol . . . ? Yes or no.

2. Did [Jenkins] possess or control a loaded or unloaded .25 caliber pistol . . . ? Yes or no.

3. Did [Jenkins] possess or control a loaded or unloaded .32 caliber revolver . . . ? Yes or no.

The jury responded to all three questions in the affirmative.

On April 1, 1998, the jury returned a verdict finding Jenkins guilty of all five counts.[6] At Jenkins's sentencing hearing, he acknowledged that he qualified as a repeat offender, pursuant to HRS § 706–606.5 (1993 & Supp. 1997).[7] He argued, however, that there were

---

6. The circuit court granted Jenkins's post-verdict motion to dismiss his conviction in connection with Count II, with the concurrence of the prosecution.

7. HRS § 706–606.5 provides in relevant part:

**Sentencing of repeat offender.** (1) Notwithstanding section 706–669 and any other law to the contrary, any person convicted of . . . any class B felony . . . and who has a prior conviction or convictions for . . . a class B felony, any of the class C felony offenses enumerated above, or any felony conviction of another jurisdiction . . . shall be sentenced to a mandatory

minimum period of imprisonment without possibility of parole during such period as follows:
. . . .
(c) Three or more prior felony convictions:
(iii) Where the instant conviction is for a class B felony—ten years[.]
. . . .
(4) . . . The court may impose a lesser mandatory minimum period of imprisonment without possibility of parole than that mandated by this section where the court finds that strong mitigating circumstances warrant such action. Strong mitigating circumstances shall include, but shall not be limited to the provisions of section 706–621.

"strong mitigating circumstances" under HRS § 706–621 (1993),[8] such that the statutorily mandated minimum sentence should be reduced from ten years to two.

In determining sentence, the circuit court observed that it was guided by a consideration of: (1) Jenkins's "pretty blatant" escape from jail in early 1998, during which he "broke a window, cut a hole in the fence, and left," and subsequently placed in danger those individuals who harbored him during his escape; (2) "a continuing escalating pattern of criminal conduct"; (3) "a continuing escalating disregard of the sanctions that are imposed"; and (4) Jenkins's failure to take responsibility for his actions. The circuit court sentenced Jenkins as a repeat offender to four concurrent indeterminate maximum ten-year prison terms, subject to four concurrent mandatory minimum terms of ten years of imprisonment. Jenkins did not respond to the circuit court's determination.

The circuit court entered its judgment, guilty conviction, and sentence on October 20, 1998. Jenkins filed a timely notice of appeal on November 19, 1998.

## II. STANDARDS OF REVIEW

### A. Admissibility Of Evidence

■ "In Hawai['']i, admission of opinion evidence is a matter within the discretion of the trial court, and only an abuse of that discretion can result in reversal." *State v. Tucker*, 10 Haw.App. 73, 89, 861 P.2d 37, 46 (1993) (citing *Sherry v. Asing*, 56 Haw. 135, 148, 531 P.2d 648, 658 (1975)) (reviewing evidence admitted pursuant to HRE Rule 701 for abuse of discretion).

### B. Denial Of Motion For Judgment Of Acquittal

■ When reviewing a ... motion for judgment of acquittal,

we employ the same standard that a trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

*State v. Jhun*, 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996) (citations and internal quotation marks omitted).

*State v. Timoteo*, 87 Hawai'i 108, 112–113, 952 P.2d 865, 869–70 (1997).

### C. Jury Instructions

■ " 'When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading,' " *State v. Kinnane*, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting *State v. Kelekolio*, 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993) (citations omitted)). . . . *See also State v. Hoey*, 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994).

" '[E]rroneous instructions are presumptively harmful and are a ground for rever-

---

8. HRS § 706–621 provides in relevant part:
 **Factors to be considered in imposing a term of probation.** The court, in determining whether to impose a term of probation, shall consider:
 (1) The factors set forth in 706–606 to the extent that they are applicable;
 (2) The following factors, to be accorded weight in favor of withholding a sentence of imprisonment:

 (a) The defendant's criminal conduct neither caused nor threatened harm;
 . . . .
 (g) The character and attitudes of the defendant indicate that the defendant is unlikely to commit another crime; [and]
 . . . .
 (i) The imprisonment of the defendant would entail excessive hardship to the defendant or the defendant's dependents[.]

sal unless it affirmatively appears from the record as a whole that the error was not prejudicial.'" *State v. Pinero,* 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) [*Pinero I*] ... (quoting *Turner v. Willis,* 59 Haw. 319, 326, 582 P.2d 710, 715 (1978)).

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. *See Yates v. Evatt,* 500 U.S. 391, 402–03 [111 S.Ct. 1884, 114 L.Ed.2d 432] (1991)[.]

*[State v.] Arceo,* 84 Hawai'i [1,] 11–12, 928 P.2d [843,] 853–54 [ (1996) ] (quoting *State v. Holbron,* 80 Hawai'i 27, 32, 904 P.2d 912, 917, *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995) (some citations omitted) (brackets in original) (emphasis deleted)); *see also State v. Loa,* 83 Hawai'i 335, 350, 926 P.2d 1258, 1273 (1996); *State v. Robinson,* 82 Hawai'i 304, 310–11, 922 P.2d 358, 364–65 (1996).

*State v. Cabrera,* 90 Hawai'i 359, 364–65, 978 P.2d 797, 802–03 (1999) (quoting *State v. Maumalanga,* 90 Hawai'i 58, 62–63, 976 P.2d 372, 376–77 (1998) (quoting *State v. Cullen,* 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997))).

### D. *Sentencing*

■■■ "The authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." *State v. Carvalho,* 90 Hawai'i 280, 284, 978 P.2d 718, 722 (1999) (quoting *Davia,* 87 Hawai'i at 253–54, 953 P.2d at 1351–52 (quoting *State v. Cornelio,* 84 Hawai'i 476, 483, 935 P.2d 1021,

1028 (1997) (quoting *State v. Gaylord,* 78 Hawai'i 127, 143–44, 890 P.2d 1167, 1183–84 (1995) (citation omitted)))).

### E. *Constitutional Law*

■■■ ... We answer questions of constitutional law "by exercising our own independent judgment based on the facts of the case." *State v. Trainor,* 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996) (citations and internal quotation marks omitted); *State v. Lee,* 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996) (citation, internal quotation marks, and brackets omitted). Thus, we review questions of constitutional law under the "right/wrong" standard. *See State v. Toyomura,* 80 Hawai'i 8, 15, 904 P.2d 893, 900 (1995) (citing *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930 (1995), and ... *Gaylord,* 78 Hawai'i [at] 137, 890 P.2d [at] 1177 ... ); *State v. Baranco,* 77 Hawai'i 351, 355, 884 P.2d 729, 733 (1994) (issue whether defendant's constitutional right against double jeopardy would be violated unless indictment dismissed is question of law, reviewed under right/wrong standard); *In re [John] Doe, Born on January 5, 1976,* 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (whether speech is protected by first amendment to United States Constitution is applied to states through fourteenth amendment and by article I, section 4 of Hawai'i Constitution are questions freely reviewable on appeal).

*Carvalho,* 90 Hawai'i at 285, 978 P.2d at 723 (quoting *State v. Quitog,* 85 Hawai'i 128, 139, 938 P.2d 559, 570 (1997) (quoting *Arceo,* 84 Hawai'i at 11, 928 P.2d at 853)) (some brackets added and some in original).

### F. *Denial Of Motion To Suppress*

■■■ "We review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was 'right' or 'wrong.'" *State v. Kauhi,* 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997) (citing *State v. Navas,* 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996)).

### G. *Credibility Of Witnesses*

■■■ "[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the [trier of

fact's] findings." *Tsugawa v. Reinartz,* 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974). We have defined "substantial evidence" as "credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *See, e.g., In re Doe, Born on January 5, 1976,* 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (citations omitted) (brackets in original).

*Aga v. Hundahl,* 78 Hawai'i 230, 237, 891 P.2d 1022, 1029 (1995). "[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the [trier of fact]." *State v. Buch,* 83 Hawai'i 308, 321, 926 P.2d 599, 612 (1996) (citation omitted).

*State v. Mattiello,* 90 Hawai'i 255, 259, 978 P.2d 693, 697 (1999) (quoting *State v. Stocker,* 90 Hawai'i 85, 90, 976 P.2d 399, 404 (1999) (quoting *State v. Lee,* 90 Hawai'i 130, 134, 976 P.2d 444, 448, *reconsideration denied* (1999) (quoting *State v. Bautista,* 86 Hawai'i 207, 210, 948 P.2d 1048, 1051 (1997)))) (brackets in original).

### H. *Plain Error*

■ "We may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Cullen,* 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997) (citations and internal quotation signals omitted). See also Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

*State v. Staley,* 91 Hawai'i 275, 282, 982 P.2d 904, 911 (1999) (quoting *Maumalanga,* 90 Hawai'i at 63, 976 P.2d at 377, (quoting *Davia,* 87 Hawai'i at 253, 953 P.2d at 1351)).

## III. *DISCUSSION*

### A. *The Circuit Court Did Not Err In Denying Jenkins's Motion To Suppress Evidence.*

Jenkins argues that "the lower court erred when it denied the motion to suppress evi-

dence." Jenkins bases his argument on the contentions that (1) the traffic stop was pretextual, (2) there were neither probable cause nor exigent circumstances to justify Officer Unga's opening the truck door and seizing the black pouch without a warrant, and (3) the bag on the driver's side floor was not in plain view. Jenkins's argument is without merit.

### 1. *The traffic stop was not merely pretextual.*

■ [T]he authority of the police to stop vehicles in cases of *observed violations* is not in question.

"In discharging their varied responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly noncriminal in nature.... Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles *when license plates or inspection stickers have expired,* or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order." *South Dakota v. Opperman,* 428 U.S. 364, 367–68, 96 S.Ct. 3092, 3095–3096, 49 L.Ed.2d 1000 (1976).

*State v. Bonds,* 59 Haw. 130, 135, 577 P.2d 781, 785 (1978) (emphases added).

■ In the present matter, Officer Unga observed that the safety inspection and tax decals on the truck had expired. He confirmed this with his dispatcher *prior* to the stop. Accordingly, the stop was effected in connection with an observed violation for the purpose of issuing a citation[9] and was not

---

9. We note that Officer Unga did not engage in this traffic stop for an "investigatory purpose." Therefore, we need not undertake the analysis set

forth in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

merely pretextual.[10]

2. *There were probable cause and exigent circumstances to justify the seizure.*

██ [A]ny warrantless search of a constitutionally protected area is presumptively unreasonable unless there is both probable cause and a legally recognized exception to the warrant requirement. [*State v.*] *Bonnell,* 75 Haw. [124,] 137, 856 P.2d [1265,] 1273 [ (1993) ]; *see also State v. Propios,* 76 Hawai'i 474, 477, 879 P.2d 1057, 1060 (1994); *State v. Perham,* 72 Haw. 290, 292, 814 P.2d 914, 915, *reconsideration denied,* 72 Haw. 616, 841 P.2d 1074 (1991); *State v. Wiley,* 69 Haw. 589, 591, 752 P.2d 102, 103 (1988); *State v. Ritte,* 68 Haw. 253, 256–57, 710 P.2d 1197, 1201 (1985); *State v. Barrett,* 67 Haw. 650, 653–54, 701 P.2d 1277, 1280 (1985); [*State v.*] *Fields,* 67 Haw. [268,] 281, 686 P.2d [1379,] 1384 [ (1984) ]; *State v. Ortiz,* 67 Haw. 181, 184, 683 P.2d 822, 825 (1984); *State v. Russo,* 67 Haw. 126, 137, 681 P.2d 553, 561 (1984); *State v. Clark,* 65 Haw. 488, 493, 654 P.2d 355, 359–60 (1982); *State v. Kaluna,* 55 Haw. 361, 363, 520 P.2d 51, 55 (1974). "In general, these exceptions provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." *Clark,* 65 Haw. at 494, 654 P.2d at 360 (citations and internal quotation marks omitted); *see also* [*State v.*] *Meyer,* 78 Hawai'i [308,] 312, 893 P.2d [159,] 163 [ (1996) ].

*State v. Wallace,* 80 Hawai'i 382, 393, 910 P.2d 695, 706 (1996).

██ "Probable cause exists when the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed." *Navas,* 81 Hawai'i at 116, 913 P.2d at 42 (citing *State v. Jerome,* 69 Haw. 132, 134, 736 P.2d 438, 439 (1987)). In the present matter, Officer Unga's training in drug recognition gave him probable cause to believe that the two packets on the ground next to the passenger's side of the truck contained evidence of a crime or contraband, *i.e.,* crystal methamphetamine or "ice." *See, e.g., Wallace,* 80 Hawai'i at 400, 910 P.2d at 713 (noting that police officer had probable cause to believe that "transparent packets" contained cocaine).

██ The next consideration is whether exigent circumstances justified the warrantless entry and seizure of the pouch containing the handgun. The exigent circumstances exception

exists when the demands of the occasion reasonably call for an immediate police response. More specifically, it includes situations presenting an immediate danger to life or serious injury or an immediate threatened removal or destruction of evidence. However, the burden, of course, is upon the government to prove the justification . . ., and whether the requisite conditions exist is to be measured from the totality of the circumstances. And in seeking to meet this burden, the police must be able to point to specific and articulable facts from which it may be determined that the action they took was necessitated by the exigencies of the situation.

*State v. Pulse,* 83 Hawai'i 229, 245, 925 P.2d 797, 813 (1996) (quoting *Clark,* 65 Haw. at 494, 654 P.2d at 360 (internal citations, quotation marks, and brackets omitted)) (ellipsis points in original).

In this case, the evidence adduced demonstrates, based on the totality of the circumstances, that Officer Unga reasonably believed that Trice and Jenkins posed a danger

---

**10.** Jenkins makes much of the fact that, at the hearing on the motion to suppress, Officer Unga testified that he did not notice the color of the decals. Jenkins contends that, at trial, "Unga switched his story to claim that he did rely on the colors [of the decals]," which demonstrates that Unga was "biased and unreliable." The circuit court judge, however, expressly found Officer Unga credible at the hearing on the motion to suppress. Jenkins had the opportunity to cross-examine Officer Unga at trial regarding the apparent alteration in his story, and it seems that the jury found Officer Unga credible nonetheless. Assessing the credibility of witnesses falls within the province of the trier of fact. *See Mattiello,* 90 Hawai'i at 259, 978 P.2d at 697. Assuming Officer Unga's credibility, there is no reason to hold that the traffic stop was pretextual.

to him. It was dark, the area was deserted, Trice and Jenkins exhibited an unusual degree of movement, and Trice refused to obey Officer Unga's order to remain in the truck. *See, e.g., State v. Bennett,* 62 Haw. 59, 64, 610 P.2d 502, 506 (1980) (upholding the validity of an investigatory stop and scanning interior of car with flashlight where it was dark and the defendant refused to comply with an order to keep both hands on the dash board); *cf. Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998) (observing that concern for officer safety is not absent "in the case of a routine traffic stop," but that concern for officer safety "does not by *itself* justify the often considerabl[e] ... intrusion attending a full field-type search" (emphasis added)). Accordingly, Officer Unga's warrantless seizure was reasonable.

3. *The driver's side pouch was in plain view.*

 The United States Supreme Court, in *Coolidge [v. New Hampshire],* held that three factors are required to merit a legitimate plain view observation: (1) prior justification for the intrusion; (2) inadvertent discovery[ ]; and (3) probable cause to believe the item is evidence of a crime or contraband. 403 U.S. [443,] 465–473 [91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ].... This court has implicitly adopted all three of the *Coolidge* requirements in [*State v.] Powell* [, 61 Haw. 316, 603 P.2d 143 (1979) ].

... Under the plain view doctrine, the requirement of exigent circumstances may be an issue where, because of the warrantless intrusion, the police were placed in plain view of the evidence. However, once the intrusion is justified, there is no requirement of exigency to seize evidence in plain view.

... This interpretation has been upheld ... by the Supreme Court ...:

The context in which the [*Coolidge* ] plurality used the phrase, ["plain view alone is never enough to justify the warrantless seizure of evidence,"] however, indicates that it was merely a rephrasing of its conclusion ... that in order for the plain-view doctrine to apply, a police of-

ficer must be engaged in a lawful intrusion or must otherwise legitimately occupy the position affording him a "plain view."

*Texas v. Brown,* 460 U.S. 730, 737 n. 3 [103 S.Ct. 1535, 1541 n. 3, 75 L.Ed.2d 502] (1983)....

 ....

In valid plain view observations, the intrusion has already lawfully occurred, and the seizure of the evidence in question is an extension of the exception to the warrant requirement. Therefore, as stated by the Supreme Court, " '[p]lain view' is perhaps better understood, ... not as an independent 'exception' to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *Brown,* 460 U.S. at 738–39 [103 S.Ct. at 1541–42]....

Based on the foregoing, we hold that, where a governmental agent is engaged in a lawful intrusion and inadvertently observes evidence of a crime, the seizure of such evidence does not require any further constitutional protection.

*Wallace,* 80 Hawai'i at 397–98, 910 P.2d at 710–11 (quoting *Meyer,* 78 Hawai'i at 314, 316–17, 893 P.2d at 165, 167–68) (some brackets and ellipsis points added and some in original) (footnote and emphases omitted).

 As noted above, Officer Unga engaged in a lawful intrusion into the truck. In the course of this investigation, he observed a blue bag on the floor of the truck, out of which was protruding the butt of a gun. Accordingly, the gun was in "plain view."

Jenkins suggests that, inasmuch as the blue bag had a Velcro flap, the gun could not have been plain view. Jenkins's characterization of the situation is overly restrictive. It is possible that the flap on the bag was not closed when Officer Unga found it or that the end of the gun was protruding out of the cover because the bag was too small to contain it. Moreover, both the circuit court judge and the jury appear to have believed Officer Unga's testimony that he was able to see the butt of the gun. As we have stated, the credibility of witnesses falls within the province of the trier of fact, *see Mattiello,* 90

Hawai'i at 259, 978 P.2d at 697, and should not be second-guessed by this court.

Inasmuch as (1) Officer Unga's traffic stop was not pretextual, (2) there were probable cause and exigent circumstances to justify a search of the truck and seizure of the black pouch, and (3) the gun in the blue bag was in plain view, Jenkins has failed to demonstrate that the guns were unlawfully secured. Accordingly, we hold that the circuit court did not err in denying Jenkins's motion to suppress evidence.

B. *The Circuit Court Did Not Err In Denying Jenkins's Motions To Dismiss Or To Continue The Case Based On The Prosecution's Inadvertent Destruction Of Evidence.*

 Citing *State v. Matafeo,* 71 Haw. 183, 787 P.2d 671 (1990), Jenkins suggests that the prosecution destroyed evidence "so critical to the defense as to make a criminal trial fundamentally unfair without it." In *Matafeo,* this court explained that "the suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment, regardless of the good faith or bad faith of the prosecution." 71 Haw. at 185, 787 P.2d at 672 (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). "However, in order to establish a *Brady* violation, an appellant must make a 'showing that the [suppressed] evidence would "creat[e] a reasonable doubt about the Appellant's guilt that would not otherwise exist." ' " *State v. Okumura,* 78 Hawai'i 383, 402, 894 P.2d 80, 99 (1995) (quoting *Matafeo,* 71 Haw. at 186, 787 P.2d at 673 (quoting *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976))) (brackets in original).

 In the instant case, evidence of illegal drugs—which Jenkins actually sought to exclude in his motion in limine—would only have cast doubts on Jenkins's character and would have done nothing to create a reasonable doubt as to his guilt. Likewise, evidence of makeup found in an eyeglasses case would merely have served to corroborate Officer Unga's testimony and, in our view,

could not conceivably have generated a reasonable doubt regarding Jenkins's guilt.

Jenkins contends that, had the black pouch been available, it could have been used (1) to prompt Officer Unga to remember that Trice actually picked *three* items off the ground, including the blue bag containing two handguns and (2) to answer the question whether it was actually large enough to hold a gun. The record is devoid of any evidence, however, that the pouch itself would have served to corroborate Jenkins's version of the events; in fact, the evidence is to the contrary. Officer Unga's testimony that the black pouch felt like it contained a small handgun is corroborated by Detective Bledsoe's testimony that the black pouch did, in fact, contain a .22 caliber pistol. In light of the evidence and testimony regarding the pouch, Jenkins's argument that the pouch *might* have been too small to hold a gun or that it *might* have spurred Officer Unga to remember the incident differently amounts to mere speculation and does not supply the necessary showing that the evidence would "creat[e] a reasonable doubt about the Appellant's guilt that would not otherwise exist." *Matafeo,* 71 Haw. at 186, 787 P.2d at 673. Consequently, no *Brady* violation occurred here.

Citing *State v. Sherman,* 70 Haw. 334, 770 P.2d 789 (1989), Jenkins contends that he should have been granted a continuance in order to investigate the reasons underlying the destruction of the evidence. In *Sherman,* a defendant was granted a continuance where the prosecution clearly failed to follow the requirements of Hawai'i Rules of Penal Procedure (HRPP) Rules 12.1(a) and (b) regarding alibi defenses. 70 Haw. at 340–41, 770 P.2d at 792–93. *Sherman* does not speak to a defendant's right to a continuance to pursue a purely speculative investigation into the destruction of non-exculpatory evidence. In the present matter, Jenkins has not pointed to any evidence that the prosecution failed to follow the requirements of any particular rule. Accordingly, *Sherman* is inapposite to the present matter.

 Moreover, "under the United States Constitution, '[w]here the state destroys evidence that has only a potential exculpatory value, due process is not offended unless the

defendant can demonstrate that the state acted in bad faith.'" *Okumura*, 78 Hawai'i at 402, 894 P.2d at 99 (citing *Matafeo*, 71 Haw. at 187, 787 P.2d at 673 (citation omitted)). While Jenkins has articulated a spirited accusation, he has supplied *no* evidence that the prosecution acted in bad faith. Therefore, Jenkins has failed to establish a violation of his constitutional right to due process.

C. *The Circuit Court Did Not Abuse Its Discretion In Admitting The Testimony Of Detective Bledsoe Regarding Enclosed Containers.*

▮▮▮ Jenkins argues that "[t]he trial court was clearly wrong to permit Detective Bledsoe to testify that the two pouches failed to fulfill the legal requirement for 'enclosed containers' pursuant to H.R.S. Section 134–6(c) when he had not been qualified as an expert." We disagree.

> HRE Rule 701 thus sets forth a liberal standard for admitting lay opinions into evidence. As long as (1) the witness has personal knowledge of matter that forms the basis of the testimony; (2) the testimony is rationally based on the witness' perception; and (3) the opinion is "helpful" to the jury (the principal test), the opinion testimony is admissible. *State v. Nishi*, 9 Haw.App. 516, 521, 852 P.2d 476, 479 (1993).

*Tucker*, 10 Haw.App. at 91, 861 P.2d at 47.

Applying the foregoing standard to the instant case, it follows that the trial court did not abuse its discretion when it permitted Detective Bledsoe to testify regarding whether the pouches qualified as rigidly constructed containers or commercial gun cases. His testimony was based on his personal knowledge, as a police detective, of the requirements regarding containers in which guns may be transported in Hawai'i. His testimony was also based on his observation and

perception of the pouches in question. The testimony was helpful in that it provided the jury with the opinion of an individual—with experience in the field of gun transport—regarding the nature of the pouches.

Jenkins does not suggest, nor does the record reflect, that testimony regarding whether the pouches qualified as rigidly constructed containers or commercial gun cases required "scientific, technical, or other specialized knowledge," such that expert testimony would have been required pursuant to HRE Rule 702 (1993). The jury was free to accept or reject Detective Bledsoe's opinion on the subject. Accordingly, the circuit court did not abuse its discretion in permitting Detective Bledsoe to testify regarding whether the pouches qualified as rigidly constructed containers or commercial gun cases when he was not qualified as an expert. *See, e.g., State v. Vallejo*, 9 Haw.App. 73, 80, 823 P.2d 154, 158 (1992) (noting that the trial court did not abuse its discretion in admitting a police officer's opinion that a particular speed limit sign was an "official" sign under HRE Rule 701).

D. *The Circuit Court Did Not Err In Denying Jenkins's Motion For Judgment Of Acquittal.*

In the "points on which [Jenkins] intends to rely" section of his opening brief, Jenkins argues that "the lower court erred when it denied [his] motion for judgment of acquittal." In the argument section of his brief, however, Jenkins limits his attack on the sufficiency of the evidence to (1) the ownership/possession/control element of the offense charged, pursuant to HRS § 134–7, *see supra* note 3, and (2) the question whether the prosecution failed to prove that Jenkins did not have a license or permit under HRS §§ 134–5 (Supp.1997),[11] pursuant to HRS § 134–6, *see supra* note 4.[12] We address these issues in turn.

---

11. HRS § 134–5 provides in relevant part:

> (a) Any person of the age of sixteen years, or over or any person under the age of sixteen years while accompanied by an adult, may carry and use any lawfully acquired rifle or shotgun and suitable ammunition while actually engaged in hunting or target shooting or while going to and from the place of hunting

> or target shooting; provided that the person has procured a hunting license under chapter 183D, part II. A hunting license shall not be required for persons engaged in target shooting.

12. Jenkins impliedly concedes, *arguendo*, that there was substantial evidence to support the other material elements of possession of a fire-

1. *There was substantial evidence for a jury to conclude that Jenkins had the requisite state of mind to commit possession of a firearm and/or ammunition by a person convicted of certain crimes.*

This court has stated that,

[g]iven the difficulty of proving the requisite state of mind by direct evidence in criminal cases, "[w]e have consistently held that ... proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the [defendant's conduct] is sufficient.... Thus, the mind of an alleged offender may be read from his acts, conduct *and inferences fairly drawn from all the circumstances.*" *State v. Sadino,* 64 Haw. 427, 430, 642 P.2d 534, 536–37 (1982) (citations omitted); *see also State v. Simpson,* 64 Haw. 363, 373 n. 7, 641 P.2d 320, 326 n. 7 (1982).

*State v. Mitsuda,* 86 Hawai'i 37, 44, 947 P.2d 349, 356, *reconsideration denied* (1997) (quoting *State v. Batson,* 73 Haw. 236, 254, 831 P.2d 924, 934 (1992)) (emphasis added).

 Officer Unga testified that Jenkins exhibited an unusual amount of movement when waiting for him to approach the truck. One bag containing a gun was found on the seat of the truck next to Jenkins. Another bag containing two guns was found on the floor of the driver's side of the truck, where Jenkins had been sitting. The jury could have inferred from the totality of these circumstances, *see Mitsuda,* 86 Hawai'i at 44, 947 P.2d at 356, that Jenkins had the state of mind requisite to commit possession of a firearm and/or ammunition by a person con-

victed of certain crimes. Therefore, this evidence was "of sufficient quality and probative value to enable a reasonable person to support the conclusion," *Timoteo,* 87 Hawai'i at 112–113, 952 P.2d at 869–70, that Jenkins intentionally, knowingly, or recklessly possessed or controlled the guns. Accordingly, the circuit court did not err in denying Jenkins's motion for judgment of acquittal on this ground.

2. *The prosecution was not required to prove that Jenkins did not have a license pursuant to HRS §§ 134–5.*

 Jenkins argues that, under the definition of place to keep pistol or revolver, pursuant to HRS § 134–6, *see supra* note 4, the prosecution was required to prove that Jenkins did *not* have a license or permit pursuant to HRS §§ 134–5, *see supra* note 11 [hereinafter, "a hunting license"].[13] Essentially, Jenkins contends that, inasmuch as the prosecution did not prove that Jenkins did not possess a hunting license, the state failed to prove an essential element of HRS § 134–6. Jenkins is mistaken.

This court has observed that,

[i]n *State v. Nobriga,* 10 Haw.App. 353, 873 P.2d 110 (1994), *overruled on other grounds by State v. Maelega,* 80 Hawai'i 172, 178–79, 907 P.2d 758, 764–65 (1995),[ ] the [Intermediate Court of Appeals (JICA[) ] set forth a framework for determining whether an "exception" is a "defense" to or an "element" of an offense:

The general and well-settled common law rule is that where an exception is embodied in the language of the enact-

arm by a person convicted of certain crimes and place to keep pistol or revolver.

13. Jenkins concedes that the prosecution adduced *prima facie* evidence of the material element that Jenkins did not have a permit pursuant to HRS § 134–9 (Supp.1997), which provides in relevant part:

(a) In an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property, the chief of police of the appropriate county may grant a license to an applicant who is a citizen of the United States of the age of twenty-one years or more or to a duly accredited official representative of a foreign nation of the age of twenty-one years or more to carry a pistol or revolver and

ammunition therefor concealed on the person within the county where the license is granted. Where the urgency or the need has been sufficiently indicated, the respective chief of police may grant to an applicant of good moral character who is a citizen of the United States of the age of twenty-one years or more, is engaged in the protection of life and property, and is not prohibited under section 134–7 from the ownership or possession of a firearm, a license to carry a pistol or revolver and ammunition therefor unconcealed on the person within the county where the license is granted. Unless renewed, the license shall expire one year from the date of issue.

ing clause of a criminal statute, and therefore appears to be an integral part of the verbal description of the offense, the burden is on the prosecution to negative that exception, prima facie, as part of its main case. Annotation, *Burden of Averment and Proof As to Exception in Criminal Statute on Which the Prosecution Is Based*, 153 A.L.R. 1218, 1226 (1944); 1 *Wharton's Criminal Evidence* § 20, at 35 (C. Torcia 13th ed.1972).

... [W]hen the exception appears somewhere other than in the enacting clause, and is thus a distinct substantive exception or proviso, the burden is on the defendant to bring forward evidence of exceptive facts that constitute a defense. Annotation, 153 A.L.R. at 1277–78; 1 *Wharton's Criminal Evidence* § 20, at 35. The prosecutor is not required in such instances to negative, by proof in advance, exceptions not found in the enacting clause. 1 *Wharton's Criminal Evidence* § 20, at 33–34.

*Nobriga*, 10 Haw.App. at [357–]58, 873 P.2d at 112–13.

*State v. Lee*, 90 Hawai'i 130, 137–38, 976 P.2d 444, 451–52, *reconsideration denied* (1999) (footnotes omitted) (some brackets added and some in original) (ellipsis points in original).

HRS § 134–6(c) provides that all firearms "shall be confined to the possessor's place of business, residence, or sojourn," "[e]xcept as provided in sections 134–5[.]" (Emphasis added.) Even if, as Jenkins suggests, the exception were embodied in the language of the enacting clause [14] of the offense of place to keep pistol or revolver—a proposition as to which we express no opinion—the general rule would still not provide Jenkins any support. In *Nobriga*, the ICA explained that the "general rule does not apply ... 'when the facts hypothesized in the exceptive provi-

sion are peculiarly within the knowledge of the defendant, or the evidence concerning them is within [the defendant's] private control.'" *Nobriga*, 10 Haw.App. at 358, 873 P.2d at 113. Inasmuch as the question whether Jenkins did or did not possess a hunting license poses a fact "peculiarly within [Jenkins's] knowledge," the general rule, which ordinarily would require the prosecution to establish that fact as part of its case-in-chief, would be inoperative.

E. *The Circuit Court Erred In Failing To Instruct The Jury Regarding One Of The Material Elements Of Place To Keep Pistol Or Revolver.*

Jenkins argues that, inasmuch as the circuit court's jury instructions failed to address the lack of a license or permit pursuant to HRS § 134–5, *see supra* note 11, the instructions omitted an essential element of place to keep pistol or revolver, pursuant to HRS § 134–6. As noted above, the lack of a hunting license is *not* a material element of HRS § 134–6. Accordingly, the circuit court did not err in failing to instruct the jury regarding hunting licenses under HRS § 134–5.[15]

Jenkins next argues that the circuit court's failure to instruct the jury that the prosecution bore the burden of proving beyond a reasonable doubt that Jenkins was away from his "place of business, residence or sojourn," pursuant to HRS § 134–6(c), resulted in the omission of a material and essential element from the jury instructions. We agree, in light of this omission, that the circuit court's insufficient jury instruction constituted error.

HRS § 134–6(e) provides in relevant part that "[a]ny person violating this section ... by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony." The mere *posses-*

---

14. "In criminal nomenclature, the term 'enacting clause' has long been applied to the prohibitory declaration of the statute which contains the general or preliminary description of the acts prohibited; i.e., the clause which proscribes the offensive deed." *Lee*, 90 Hawai'i at 137 n. 7, 976 P.2d at 451 n. 7 (quoting *Nobriga*, 10 Haw.App. at 357 n. 1, 873 P.2d at 112 n. 1 (citation omitted)).

15. Likewise, the circuit court did not err in refusing to give Jenkins's Supplemental Instructions Nos. 2, 3, and 4, which inaccurately characterized the lack of a hunting license as an essential element of HRS § 134–6.

**108**

*sion,* without more, of a pistol or revolver without a license issued as provided in HRS § 134–9 is not illegal, however. *See, e.g.,* HRS § 134–3 (Supp.1997) (prescribing the mechanism for the lawful registration of firearms including, *inter alia,* pistols and revolvers). Accordingly, HRS § 134–6(e) cannot be read alone, but, rather, must be read in conjunction with HRS § 134–6(c). "We read statutory language in the context of the *entire* statute, and construe it in a manner consistent with its purpose." *State v. Mahoe,* 89 Hawai'i 284, 288, 972 P.2d 287, 291 (1998) (quoting *Bautista,* 86 Hawai'i at 209, 948 P.2d at 1050) (emphasis added). HRS § 134–6(c) provides in relevant part that "all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn." Accordingly, HRS § 134–6(e) provides that it is a criminal offense if firearms are not "confined to the possessor's place of business, residence, or sojourn."

 This court adheres to the proposition that "an essential or material element of a crime [i]s one whose specification with precise accuracy is necessary to establish the very illegality of the behavior and thus the court's jurisdiction." *State v. Vanstory,* 91 Hawai'i 33, 44, 979 P.2d 1059, 1070 (1999) (quoting *United States v. Johnson,* 152 F.3d 618, 630 (7th Cir.1998)) (brackets in original). Unless a firearm is possessed or carried away from the "possessor's place of business, residence, or sojourn," there can be no illegal behavior in the "carrying or possessing [of] a loaded firearm" or the "carrying or possessing [of] a loaded or unloaded pistol or revolver without a license as provided in section 134–9," pursuant to HRS § 134–6(e). Accordingly, it is a material element of place to keep pistol or revolver that the firearm at issue be away from the possessor's "place of business, residence, or sojourn."

 " 'It is well established, as a precept of constitutional as well as statutory law, that an accused in a criminal case can only be convicted upon proof by the prosecution of *every [material] element of the crime charged* beyond a reasonable doubt.' " *Wal-*

*lace,* 80 Hawai'i at 406, 910 P.2d at 719 (quoting *State v. Puaoi,* 78 Hawai'i 185, 191, 891 P.2d 272, 278 (1995) (quoting *State v. Lima,* 64 Haw. 470, 474, 643 P.2d 536, 539 (1982))) (brackets and emphasis in original). Indeed, HRS § 701–114 (1993) provides in relevant part that "no person may be convicted of an offense unless the following are proved beyond a reasonable doubt: ... each element of the offense[.]" "A defendant may not be convicted except upon proof beyond a reasonable doubt of *every fact necessary to constitute the crime* with which he is charged." *State v. Perez,* 90 Hawai'i 113, 128, 976 P.2d 427, 442 (App.1998), *reversed in part on other grounds,* 90 Hawai'i 65, 976 P.2d 379, *reconsideration denied* (1999) (quoting *State v. Iosefa,* 77 Hawai'i 177, 183, 880 P.2d 1224, 1230 (1994) (quoting *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970))) (emphasis added) (internal quotation signals omitted).

 "It is a grave error to submit a [criminal] case to a jury without accurately defining the offense charged and its elements."[16] *Pinero I,* 70 Haw. at 527, 778 P.2d at 715 (quoting 2 C. Wright, *Federal Practice and Procedure: Criminal 2d* § 487, at 723) (1982) (brackets in original); *cf. Arceo,* 84 Hawai'i at 32–33, 928 P.2d at 874–75 (holding that trial court committed plain error in failing to give a specific unanimity instruction where "separate and distinct culpable acts are subsumed within a single count ... [,] any one of which could support a conviction thereunder"). Accordingly, the jury may not be instructed in a manner that would relieve the prosecution of its burden of proving every element of the offense charged. *Cf. State v. Soares,* 72 Haw. 278, 282, 815 P.2d 428, 430 (1991) (holding that the trial court erred in instructing the jury such that the prosecution was "relieved from its burden of proving that appellants acted with the requisite intent"). Furthermore, "[m]erely informing the jury that it should consider the court's instructions as a whole cannot obviate an error of *omission* where the remaining instructions fail to provide the

---

**16.** In *Pinero I,* this court examined whether the omission of the mental element of a crime from jury instructions constituted prejudicial error

and held that it did. 70 Haw. at 526–27, 778 P.2d at 715–16.

crucial information." *State v. Tabigne,* 88 Hawai'i 296, 305, 966 P.2d 608, 617 (1998) (emphasis in original).

In the instant matter, by omitting an element of the crime of place to keep pistol or revolver, the jury was precluded from considering whether Jenkins possessed the firearms in his "place of business, residence, or sojourn" precisely because it was never instructed that it must find whether the prosecution had proved beyond a reasonable doubt that Jenkins possessed or carried firearms away from his "place of business, residence, or sojourn"; therefore, the jurors were unable to find Jenkins guilty of all of the material elements of place to keep pistol or revolver, pursuant to HRS § 134–6. Accordingly, the prosecution was relieved of its burden of proving every essential element beyond a reasonable doubt. Jenkins may well be guilty of the offenses charged against him, but he is entitled to a fair trial according to established principles of law, with a jury finding on each and every element of the offenses charged. Accordingly, we hold that the trial court erred in failing to instruct the jury regarding all of the material elements of the offense.

F. *The Prosecution's Jury Instructions Nos. 1, 2, 11, 16, And 17 Did Not Sufficiently Instruct The Jury Regarding State Of Mind.*

Jenkins asserts that the prosecution's jury instructions Nos. 1, 2, 11, 16, and 17 erroneously instructed the jury that it might consider recklessness as a state of mind in determining his guilt. Specifically, Jenkins contends that, "since the [prosecution's] case against Jenkins was based on constructive possession rather than actual possession, there had to be a 'knowing' or 'intentional' state of mind with regards to the possession, rather than just 'reckless.' " Although Jenkins mischaracterizes the prosecution's case, we agree that the circuit court's instructions were insufficient with regard to the states of mind requisite to violations of HRS §§ 134–7(b), *see supra* note 3, and 134–6(e), *see supra* note 4. We address these statutes in turn.

1. *State of mind requisite to a violation of HRS § 134–7(b)*

HRS § 134–7(b) provides that no person who has been convicted of a felony shall "own, possess, or control any firearm or ammunition therefor." Accordingly, a person may be found guilty of violating HRS § 134–7(b) if the prosecution proves ownership *or* possession *or* control. Inasmuch as the jury must be instructed regarding the mental state requisite to the commission of an offense, *see Pinero I,* 70 Haw. at 527, 778 P.2d at 715, we must determine the scienter implicated by the term "possession." [17]

HRS § 134–7(b) is silent regarding the state of mind requisite for conviction. HRS § 702–204 (1993) provides that, "[w]hen the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly." Indeed, this court has cited HRS § 702–204 for the proposition that "HRS § 134–7(b) is established when a previously convicted felon possesses or controls a firearm 'intentionally, knowingly, *or recklessly.*' " [18] *Pinero I,* 70 Haw. at 526, 778 P.2d at 715 (emphasis added).

17. This jurisdiction has impliedly subsumed the term "control" within the definition of "possession." *See, e.g., State v. Moniz,* 92 Hawai'i 472, 992 P.2d 741 (App.1999); *State v. Auwae,* 89 Hawai'i 59, 62–63, 968 P.2d 1070, 1073–74 (App. 1998); *State v. Mundell,* 8 Haw.App. 610, 617, 822 P.2d 23, 27 (1991) (citing *Black's Law Dictionary* 1163 (6th ed.1990)). Likewise, "control" is subsumed within the definition of "possession" as a "voluntary act" in HRS § 702–202 (1993), *see infra.* Accordingly, for the purposes of this analysis, the scienter requirement for "possession" may also be applied to "control."

Inasmuch as the prosecution in the present matter expressly excluded "ownership" from its

closing jury argument regarding HRS § 134–7(b), we need not construe the term "ownership" herein.

18. The legislature has also expressly recognized the concept of "reckless possession" in a penal statute. HRS § 708–870 (1993) provides in relevant part that "[a] person commits the offense of deceptive business practices if in the course of engaging in a business, occupation, or profession the person knowingly or *recklessly ... possesses* for use a false weight or measure, or any other device for falsely determining or recording any quality or quantity." (Emphases added.) *Cf.* HRS §§ 183D–32 (1993) ("[n]o person shall in-

However, illegal conduct must entail a voluntary act or omission in order to trigger criminal liability. *See* HRS § 702–200(1) (1993).[19] Because, "possession," in itself, need not entail a "bodily movement" or an "omission," *see supra* note 19, HRS § 702–202 (1993) provides expressly that "possession" is a voluntary act only "if the defendant *knowingly* procured or received the thing possessed or if the defendant *was aware of* the defendant's control of it for a sufficient period to have been able to terminate the defendant's possession." HRS § 702–202 (1993) (emphases added). Accordingly, in order for "possession" to be a "voluntary act," some level of knowledge is required.

▮▮▮▮▮ In fact, the term "possession" has been described in this jurisdiction as follows:

> The law, in general, recognizes two kinds of possession: actual possession and constructive possession. A person who *knowingly* has direct physical control over a thing at a given time is then in actual possession of it. A person who, although not in actual possession, *knowingly* has both the power and the intention at a given time to exercise dominion over a thing, either directly or through another person

or persons, is then in constructive possession of it.

*State v. Mundell*, 8 Haw.App. 610, 617, 822 P.2d 23, 27 (1991) (citing *Black's Law Dictionary* 1163 (6th ed.1990)) (emphases added);[20] *see also State v. Auwae*, 89 Hawai'i 59, 62–63, 968 P.2d 1070, 1073–74 (App.1998); *State v. Sequin*, 9 Haw.App. 551, 559–60, 851 P.2d 926, 930 (1993). *Cf. State v. Opupele*, 88 Hawai'i 433, 439, 967 P.2d 265, 271 (1998), in which this court stated that "[t]he correctness of [the foregoing definition], as a general definition of possession, is not in dispute." HRS § 702–208 (1993) provides that, "[w]hen the law provides that acting knowingly is sufficient to establish an element of an offense, that element is also established if, with respect thereto, a person acts intentionally." Accordingly, pursuant to HRS § 702–202 and the characterization of voluntary "possession" set forth above, an individual may be found to have "possessed" a thing only if he or she did so "knowingly" or "intentionally." Correlatively, an individual may not be found to have voluntarily "possessed" a thing if he or she was merely "reckless" in doing so.[21]

Thus, as applied to HRS § 134–7(b) in *Auwae* and *Pinero I*, HRS §§ 702–202 and 702–204 appear to be in tension, the former negating the possibility of "reckless posses-

tentionally, knowingly, or *recklessly* take, kill, pursue, or have in *possession* any bird declared as a game bird by law or by rule of the department" (emphases added)) and 190D–35 (1993) ("[a]ny person who ... wilfully or *recklessly* damages, disturbs, interferes with, takes, or *possesses* any improvements, assets, marine plants or animals, or equipment in an area leased to a person, without the permission of that person, shall be subject to civil proceedings" (emphases added)).

19. HRS § 702–200(1) provides that "[i]n any prosecution it is a defense that the conduct alleged does not include a voluntary act or the voluntary omission to perform an act of which the defendant is physically capable." HRS § 702–201 defines "voluntary act" as "a bodily movement performed consciously or habitually as the result of the effort or determination of the defendant."

20. We note that the offense with which Mundell was charged required, on its face, at least "knowing" possession. *See Mundell*, 8 Haw. App. at 612, 822 P.2d at 25; HRS § 712–1243 (1985).

21. A person acts recklessly, *inter alia*, when he or she "consciously disregards a substantial and unjustifiable risk." HRS § 702–206(3) (1993). A person acts knowingly, *inter alia*, when he or she "is aware" of conduct or circumstances. HRS § 702–206(2) (1993). The statutory definition of recklessness does not contemplate that a defendant need be "aware" of conduct and circumstances, as statutorily required of knowledge. One who acts recklessly, therefore, does not also act knowingly. *See People v. Spears*, 112 Ill.2d 396, 98 Ill.Dec. 9, 493 N.E.2d 1030, 1035 (1986) (observing that "it does not follow ... that one who acts recklessly also acts knowingly"); *cf. State v. Holbron*, 80 Hawai'i 27, 35, 904 P.2d 912, 920 (1995) (noting that "recklessness and 'desire or intention' are mutually exclusive"). "Recklessness" cannot, therefore, be applied to the term "possession" as it is employed in the *Mundell* framework. *See, e.g., Auwae*, 89 Hawai'i at 63, 968 P.2d at 1074 (holding that the term "'possess' in HRS § 134–7(b) means to (1) *knowingly* procure or receive a firearm or ammunition, or (2) *be aware of* one's control over a firearm or ammunition for a sufficient period to have been able to terminate that possession" (emphases added)).

sion" and the latter expressly establishing it. This apparent conflict may be reconciled, however, by looking to the commentary on HRS § 702–202, which advises in relevant part:

> Offenses of possession are pervasive in the law, but possession per se is not a bodily movement or an omission, although the course of conduct leading to or continuing possession might include a voluntary act or omission. Therefore, this section makes it explicit that possession is an act, within the meaning of §§ 702–200 and 201, [*see supra* note 19,] if the possessor knowingly procured or received the thing possessed or was aware of control thereof for a sufficient period to have been able to terminate possession. *The "thing possessed" refers to the physical object per se[;] knowledge of particular qualities or properties of the physical object possessed is dealt with as a mens rea problem in subsequent sections.*

Commentary on HRS § 702–202 (emphasis added). In other words, HRS § 702–202 establishes the scienter requisite only for the possession of a thing *itself.* Accordingly, to be convicted of possession, one must have played a voluntary—or, in this case, knowing—role in the act of possessing an object.

▮▮▮ However, the understanding of the "particular qualities or properties" of the object that make it a crime to possess the object are "dealt with as a mens rea problem." Inasmuch as HRS § 134–7(b) lacks a scienter requirement, HRS § 702–204 must be applied to the "mens rea problem." Accordingly, "possession" as it regards the particular qualities of an object that make the possession of it a crime may be satisfied by a finding of recklessness.

To illustrate this point, assume that HRS § 702–204 applies to a hypothetical statute that precluded the possession of controlled substances but does not expressly designate a requisite state of mind. To prove the "voluntary act" of "possession," the prosecution would be required to prove that a defendant knowingly or intentionally procured a bag containing some substance. However, for criminal culpability to attach, the prosecution would also be required to prove the requisite state of mind with regard to the qualities of the substance, *i.e.,* that the defendant possessed the object in reckless disregard of the substantial and unjustifiable risk that the substance was, say, marijuana. Similarly, and by way of further illustration, when applying HRS § 702–204 to a hypothetical statute that prohibited the possession of a "sawed-off" shotgun, the prosecution would be required to prove that the defendant knowingly procured the shotgun. To prove the requisite state of mind regarding the particular qualities of the shotgun, the prosecution would then be required to prove that the defendant had acted in reckless disregard of the substantial and unjustifiable risk that the shotgun had the qualities and characteristics of being a "sawed-off" shotgun.

▮▮▮ In light of the foregoing, we hold that, for the purposes of HRS § 134–7(b), "possession" must be analyzed employing a two-pronged analysis: (1) the voluntary act of "possession" of an object *itself* is, by way of HRS § 702–202, satisfied where an individual acts knowingly with respect to his or her conduct; and (2) the requisite state of mind with respect to the attendant circumstances—*i.e.,* the particular qualities of the object that make it illegal to possess it—is, by way of HRS § 702–204, satisfied by a reckless state of mind. Thus, as applied, to prove the "voluntary act" of possession, the prosecution must first adduce evidence that the defendant knowingly procured or received an object, or was aware of his or her control of that object for a sufficient period to have terminated possession. *See* HRS § 702–202. Second, to prove the requisite state of mind regarding the particular qualities of the object, the prosecution must, at the very least, adduce evidence that the defendant possessed the object in reckless disregard of the substantial and unjustifiable risk that it was a firearm. *See* HRS § 702–204. The jury in the present case should have been instructed in accordance with this analysis.

▮▮▮ As a general rule,

> we do not lightly disregard precedent; we subscribe to the view that great con-

sideration should always be accorded precedent, especially one of long standing and general acceptance. Yet, it does not necessarily follow that a rule established by precedent is infallible. If unintended injury would result by following the previous decision, corrective action is in order; for we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the liability to error and the advantages of review.

*Espaniola v. Cawdrey Mars Joint Venture*, 68 Haw. 171, 182–83, 707 P.2d 365, 373 (1985). As this court has long recognized, "[w]e not only have the right but are entrusted with a duty to examine the former decisions of this court and [,] when reconciliation is impossible, to discard our former errors." *Koike v. Board of Water Supply*, 44 Haw. 100, 117–18, 352 P.2d 835, 845, *reh'g denied*, 44 Haw. 146, 352 P.2d 835 (1960); *see also Parke v. Parke*, 25 Haw. 397, 401 (1920) ("It is generally better to establish a new rule than to follow a bad precedent.").

*Francis v. Lee Enters.*, 89 Hawai'i 234, 236, 971 P.2d 707, 709 (1999) (brackets in original).

In *Auwae*, the ICA defined the term "possess," as set forth in HRS § 134–7(b), as "to (1) *knowingly* procure or receive a firearm or ammunition, or (2) *be aware of* one's own control over a firearm or ammunition for a sufficient period to have been able to terminate that possession." 89 Hawai'i at 63, 968 P.2d at 1074 (emphases added). This is in direct opposition to our holding today regarding the two-pronged analysis of the term "possession." Accordingly, we overrule *Auwae* insofar as it conflicts with our holding. For the same reason, we likewise overrule *Mundell* to the extent that the definition of the word "possession" therein is incompatible with this analysis.

2. *State of mind requisite to a violation of HRS § 134–6(e)*

■ HRS § 134–6(e) provides that a person shall be guilty of a felony if he or she violates the section by "carrying or possessing a loaded or unloaded pistol or revolver

without a license." We note that, by the statute's plain language, "carrying" and "possessing" are not synonymous.

The appellate courts of this jurisdiction have not as yet expressly defined the term "carry." HRS § 134–6 employs "carry" in terms of both carrying "on the person" and carrying "in a vehicle." *See supra* note 4. The United States Supreme Court has recently defined the term "carry" as follows:

Consider first the word's primary meaning. *The Oxford English Dictionary* gives as its first definition "convey, originally by cart or wagon, hence in any vehicle, by ship, on horseback, etc." 2 *Oxford English Dictionary* 919 (2d ed.1989); *see also Webster's Third New International Dictionary* 343 (1986) (first definition: "move while supporting (as in a vehicle or in one's hands or arms)"); *The Random House Dictionary of the English Language Unabridged* 319 (2d ed.1987) (first definition: "to take or support from one place to another; convey; transport").

*Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 1914, 141 L.Ed.2d 111 (1998).

Neither HRS § 134–6 nor the foregoing definition of "carry"—styled by the *Muscarello* Court as its "ordinary meaning," *see id.* at 1916—expressly prescribes a particular requisite state of mind. Therefore, it would appear that "carrying" could be established if, "with respect thereto, a person acts intentionally, knowingly, or recklessly." HRS § 702–204, *see supra* section III.F.1.

■ "Carrying," however, "implies personal agency and some degree of *possession* [.]" *Muscarello*, 118 S.Ct. at 1913, 1917 (holding that the phrase "carries a firearm" "applies to a person who knowingly possesses and conveys firearms in a vehicle") (emphasis added). Inasmuch as "carrying" implies some kind of "possession," the "knowing" requirement of HRS § 702–202, *see supra* section III.F.1, is triggered. Again, as above, HRS §§ 702–202 and 702–204 appear to be in tension.

In light of the reasoning set out *supra* in section III.F.1, we hold that, for the purposes of HRS § 134–6(e), "carry" must be analyzed employing a two-pronged analysis:

(1) the voluntary act of "carrying" an object is, by way of HRS § 702–202, established when an individual acts knowingly with respect to that conduct; and (2) the requisite state of mind with respect to the circumstances attendant to "carrying" that object, *i.e.*, the object's particular attributes rendering its carrying a criminal offense—in this case, the quality of *being a firearm*—is, by way of HRS § 702–204, established by proof of a reckless state of mind. Accordingly, in its jury instruction regarding HRS § 134–6(e), the circuit court should have provided the two-pronged analysis outlined above: that Jenkins carried or possessed a firearm, in violation of HRS § 134–6(e), with (a) intent or knowledge that he carried or possessed an object and (b) with intent, knowledge, or reckless disregard of the substantial and unjustifiable risk that the object was a pistol or a revolver.

G. *The Circuit Court's Unanimity Instruction Did Not Give Rise To Reversible Error.*

█ Jenkins argues that "the wording of the [circuit court's] specific unanimity instruction was prejudicially confusing in that it told the jury to decide Jenkins'[s] guilt before considering whether they had unanimity on a specific firearm." Given controlling Hawai'i precedent, however, we cannot discern reversible error on this ground.

In the absence of an express election by the prosecution, *Arceo* mandates that the jury be given a specific unanimity instruction "when separate and distinct culpable acts are subsumed within a single count ... any of which could support a conviction thereunder[.]" 84 Hawai'i at 32–33, 928 P.2d at 874–75. HRS § 134–7, *see supra* note 3, requires that the prosecution prove beyond a reasonable doubt that a defendant has owned, possessed, or controlled "any firearm." The record in the instant matter reflects that there were three firearms in the truck, the possession of each of which could be deemed a "separate and distinct culpable act[ ]." Jenkins was charged in Count I with owning, possessing, or controlling "a firearm." Although couched in the indictment as a single count of possession of a firearm by a person

convicted of certain crimes, *three* culpable acts were in fact charged—(1) ownership, control, or possession of a .22 caliber pistol, (2) ownership, control, or possession of a .25 caliber pistol, and (3) ownership, control, or possession of a .32 caliber revolver. The jury was, therefore, required unanimously to agree as to which firearm(s) Jenkins owned, possessed, or controlled *before* it reached a guilty verdict. The circuit court charged the jury to reach unanimity regarding particular firearms only *after* it reached a guilty verdict regarding the offense of possession of a firearm by a person convicted of certain crimes, as charged in Count I.

█ It was error for the circuit court to instruct the jury to reach unanimity regarding an element of the charged offense only after it had reached a guilty verdict with respect to that offense. *State v. Tanaka,* 92 Hawai'i 675, 680, 994 P.2d 607, 612 (Ct.App. 1999) ("[T]he teaching of *Arceo* is that the jury must achieve unanimity as to each material element of a criminal offense *before* it can find a defendant guilty. The unanimity requirement is an essential part and parcel of the jury's formulation of its guilty verdict, not an afterthought." (Footnote omitted.) (Emphasis in original.)). The defect, however, does not rise to the level of reversible error under the circumstances of the present case. First, inasmuch as the circuit court instructed the jury that it "*must* determine that [Jenkins] ... possessed or controlled at least one of the firearms" (emphasis added), the circuit court *did,* in fact, require that the jury reach unanimity regarding the "firearms" element of the offense. Second, the special verdict form that the jury returned reflected on its face that the jury agreed unanimously that Jenkins possessed or controlled *all three* of the firearms at issue. This determination eliminated the possibility that some of the jurors believed Jenkins to be guilty of possessing one of the firearms, while others believed Jenkins to be guilty of possessing another. Accordingly, the question whether Jenkins was granted his "substantial constitutional right to [a] unanimous jury verdict" does not arise in the present matter. *Arceo,* 84 Hawai'i at 33, 928 P.2d at 875. Inasmuch as we know, conclusively, that the jury's verdict regarding the firearms at issue was in fact unanimous, we cannot hold that Jenkins's right to a unanimous verdict was violated or that the circuit court's

specific unanimity instruction was prejudicially misleading.[22]

H. *The Circuit Court's Imposition Of Four Concurrent Mandatory Minimum Terms Of Ten Years' Imprisonment, Without A Downward Departure For Strong Mitigating Circumstances, Did Not Constitute Cruel and Unusual Punishment.*

 Jenkins contends that "the mandatory term of ten years was cruel and unusual punishment in light of the actual facts of the case and [Jenkins's] past history." More precisely, Jenkins argues that the circuit court, in failing to opt for a downward departure from the ten-year mandatory minimum term of incarceration prescribed by HRS § 706–606.5(1)(c)(iii), *see supra* note 7, imposed a sentence on him that amounted to constitutionally cruel and unusual punishment. Correlatively, Jenkins suggests that it was cruel and unusual punishment for the sentencing court not to find "strong mitigating circumstances" pursuant to HRS § 706–606.5(4), *see supra* note 7. We note that Jenkins did not raise this issue before the sentencing court. Accordingly, we review the decision of the sentencing court for plain error.

> "The standard by which punishment is to be judged under the 'cruel and unusual' punishment provisions of both the United States and Hawaii Constitutions is whether[,] in the light of developing concepts of decency and fairness, the prescribed punishment is so disproportionate to the conduct proscribed and is of such duration as to shock the conscience of reasonable persons or to outrage the moral sense of the community."

*State v. Kumukau,* 71 Haw. 218, 226–27, 787 P.2d 682, 687 (1990) (quoting *State v. Freitas,* 61 Haw., 262, 267–68, 602 P.2d 914, 920 (1979)). "The question of what constitutes an adequate penalty necessary for the prevention of crime is addressed to the sound judgment of the legislature and the courts will not interfere with its exercise, unless the punishment prescribed appears clearly and manifestly to be cruel and unusual." *Freitas,* 61 Haw. at 267, 602 P.2d at 920. In *Freitas,* this court borrowed a three-pronged test from *In re Lynch,* 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921 (1973), as an interpretive guide for the analysis of whether a punishment is "clearly and manifestly" cruel and unusual. *Freitas,* 61 Haw. at 268, 602 P.2d at 920. The *Lynch* test directs the court to consider:

> (1) the nature of the offense and/or the offender, with particular regard to the degree of danger posed by both to society; (2) the extent of the challenged penalty as compared to the punishments prescribed for more serious crimes within the same jurisdiction; and (3) the extent of the challenged penalty as compared to the punishment prescribed for the same offense in other jurisdictions.

*Id.* In using this test, "the nature of the offense and the danger the offender poses to society are the key factors in this determination." *Id.*

*Davia,* 87 Hawai'i at 258, 953 P.2d at 1356.

With regard to the first prong of the *Freitas/Lynch* test (*i.e.,* the "key factors"), Jenkins argues that, in the present matter, "there was no evidence that Jenkins ever handled or intended to use any of the firearms." He also points out that his prior felony convictions were for non-violent crimes. As the circuit court noted, however, Jenkins escaped from prison in early 1998, posing a danger to those who harbored him. Jenkins's penal history also reflected a string of escalating offenses, for which he did not appear to accept personal accountability. Therefore, while Jenkins may not have committed any violent crimes, he could reasonably be deemed to pose a danger to society.

With regard to the second prong of the *Freitas/Lynch* test, we note that more serious crimes by repeat offenders may be punished in Hawai'i by mandatory minimum terms of up to thirty years. *See* HRS § 706–606.5(1)(c)(i) (1993 & Supp.1998). A court

---

**22.** Jenkins hypothesizes that it is quite likely that the jury "conclude[d] that, since they've already found Jenkins guilty of the substantive crime, they should find him guilty for all the firearms in order to keep things 'neat.'" This is pure speculation. "Appellate courts defer to the judge or jury as fact finder ... because the fact finder is uniquely qualified to evaluate the credibility of witnesses and to weigh the evidence." *Briones v. State,* 74 Haw. 442, 464, 848 P.2d 966, 977 (1993). The jury in the present matter reached a finding regarding all three firearms, and it is not for this court to assume that they did so for the purposes of "neatness."

may also order multiple terms of imprisonment to run consecutively, rather than concurrently. *See* HRS § 706.668.5 (1993). Compared with the possibility of much longer mandatory minimum terms of imprisonment and sentences running consecutively, Jenkins's four concurrent mandatory minimum terms of ten years' incarceration do not appear to us to be disproportionately onerous.

Finally, with regard to the third prong of the *Freitas/Lynch* test, our research reveals that other jurisdictions permit significantly lengthier sentences for repeat offenders. In Oklahoma, for example, a person convicted of a felony who has committed three prior felonies receives a mandatory minimum sentence of twenty years. OKLA. STAT. tit. 21, § 51(b) (Supp.1999). Many statutory schemes provide for the possibility of life imprisonment for repeat offenders. *See, e.g.*, VT. STAT. ANN. tit. 13, § 19 (1998) (providing that a felon who has committed three prior felonies may be sentenced to life imprisonment); *cf. People v. Cline*, 60 Cal.App.4th 1327, 1338, 71 Cal.Rptr.2d 41, 47 (Cal.Ct.App.1998) (noting that "a comparison of California's punishment for recidivists with punishment for recidivists in other states shows that many of the statutory schemes provide for life imprisonment for repeat offenders"). By comparison, the circuit court's refusal to find "strong mitigating circumstances" and Jenkins's resultant sentence of ten years is far from draconian.

In our view, and on balance, it was not cruel and unusual punishment for the sentencing court to refuse to find "strong mitigating circumstances" and to sentence Jenkins to concurrent mandatory minimum prison terms of ten years. Accordingly, we hold that Jenkins's sentence did not violate the eighth amendment to the United States Constitution or article I, section 12 of the Hawai'i Constitution.

## IV. *CONCLUSION*

Based on the foregoing analysis, we vacate Jenkins's judgment, guilty conviction, and sentence, and remand the matter for a new trial.

Opinion by WATANABE, J., Dissenting in part and Concurring in part.

I have grave concerns about the majority's overruling of *State v. Auwae*, 89 Hawai'i 59, 968 P.2d 1070 (App.1998), and *State v. Mundell*, 8 Haw.App. 610, 822 P.2d 23 (1991), and the establishment by the majority of a new "two-pronged analysis" for determining whether a felon is in "possession" of a firearm. I believe that the new test adopted by the majority will lead to confusion, especially in cases such as this one, which involves constructive, as opposed to actual, possession. Moreover, since it is a well-established rule of statutory construction that "where there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored," *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 55, 868 P.2d 1193, 1202, I believe that the more specific requirement in Hawai'i Revised Statutes (HRS) § 702–202 (1993) that possession must be "knowing" must trump the more general default scienter requirement set forth in HRS § 702–204 (1993).

Additionally, although the issue has not been raised on appeal, I am troubled by whether double jeopardy principles allow Jenkins to be convicted and punished for both being a felon in possession of a firearm or ammunition and failing to confine a firearm or ammunition to his "place of business, residence, or sojourn." The majority states that "it is a material element of place to keep pistol or revolver that the firearm at issue be away from the possessor's 'place of business, residence, or sojourn.'" Majority Opinion at 108, 997 P.2d at 34. Therefore, according to the majority, the jury must be instructed that it is the State's burden to prove beyond a reasonable doubt that "Jenkins possessed or carried firearms away from his 'place of business, residence, or sojourn.'" *Id.* at 109, 997 P.2d at 35. However, as a convicted felon, Jenkins was not allowed to possess *any* firearm or ammunition at *any* time or place. Therefore, I believe that a serious double jeopardy issue is presented if Jenkins is convicted and sentenced for violating both HRS § 134–7(b) and HRS § 134–6(c), based on the same conduct of possessing a firearm or ammunition. I believe this issue should be briefed and addressed on remand.

In all other respects, I concur with the majority.